[No. B094380. Second Dist., Div. Four. Mar. 2, 1998.]

CITY OF HAWAIIAN GARDENS et al., Plaintiffs and Respondents, v. CITY OF LONG BEACH et al., Defendants and Appellants.

[No. B098429. Second Dist., Div. Four. Mar. 2, 1998.]

CITY OF HAWAIIAN GARDENS et al., Plaintiffs and Appellants, v. CITY OF LONG BEACH et al., Defendants and Respondents.

COUNSEL

Cox, Castle & Nicholson, and Tamar C. Stein for Plaintiffs and Appellants and for Plaintiffs and Respondents.

John R. Calhoun, City Attorney, and Heather A. Mahood, Principal Deputy City Attorney, for Defendants and Appellants and for Defendants and Respondents.

## OPINION

**EPSTEIN, Acting P. J.**—The City of Long Beach appeals from a trial court adjudication that it is not entitled to close one of its streets at the border with the City of Hawaiian Gardens. The ruling is based on Vehicle Code section 21101, subdivision (f) (section 21101(f)), which we shall discuss in detail.

Hawaiian Gardens has cross-appealed from the trial court's denial of its motion for attorney's fees under Code of Civil Procedure section 1021.5 and 42 United States Code section 1988.

We conclude that the proposed closure was inconsistent with section 21101(f) because closure of the roadway is likely to have a significant negative impact on residents of Hawaiian Gardens as well as on the provision of fire and police emergency services. We also conclude that the trial court ruled correctly in denying Hawaiian Gardens' application for attorney's fees. Hawaiian Gardens failed to show that the burden of bringing the litigation was disproportionate to the benefits conferred on its citizens, a showing that is requisite to support an award of fees under the private attorney general doctrine. Finally, we conclude that the trial court did not abuse its discretion in denying fees under 42 United States Code section 1988 because the case was not tried on that theory and the judgment was not based on a civil rights violation. We therefore affirm the judgment in its entirety.

### FACTUAL AND PROCEDURAL SUMMARY

We begin with a brief description of the pertinent geography. This appeal concerns traffic problems in and around El Dorado Park Estates (El Dorado), the only Long Beach neighborhood located east of the San Gabriel Freeway (605 Freeway). It is bordered on the west by that freeway, and on the north by the City of Hawaiian Gardens. El Dorado is divided by Wardlow Road, an east-west thoroughfare. This litigation concerns measures taken by Long

Beach to resolve traffic problems in the area north of Wardlow Road by closing Pioneer Boulevard at its border with Hawaiian Gardens.

Pioneer Boulevard is a collector road running adjacent to the 605 Freeway, through Hawaiian Gardens and into the northern edge of El Dorado. An exit from the 605 Freeway deposits traffic onto Pioneer Boulevard in Hawaiian Gardens, just south of Carson Boulevard and north of 219th Street. One block north of the proposed closure on Pioneer Boulevard is 223rd Street, in Hawaiian Gardens. Pioneer Park is located at the intersection of Pioneer and 223rd Street. It is a small park with playground equipment, benches, and grass. It is heavily used by children and other residents of the area. Four blocks east of Pioneer, on 223rd Street, is Ferguson Elementary School, the largest elementary school in Hawaiian Gardens, with 770 students in kindergarten through the sixth grade. 223rd Street is a designated safe-route-to-school road for Ferguson Elementary.

Inside the Long Beach city limits, in El Dorado, Pioneer Boulevard becomes Ritchie Street. It curves to the east and then turns south, becoming Claremore Street. This street is the only direct access between northern El Dorado and Hawaiian Gardens.[1] It is a two-lane street which passes through the single-family residential El Dorado neighborhood. A large wall extends along the northern border of El Dorado with Hawaiian Gardens, and all the north-south streets in the neighborhood dead-end. Claremore and Lama Avenue provide access to Wardlow Road; all other north-south streets in northern El Dorado dead end before Wardlow.

As a result of this traffic pattern, drivers exiting the 605 Freeway who wish to travel south take Pioneer/Ritchie/Claremore, bypassing congestion in Hawaiian Gardens on Carson Boulevard and other streets in the area. Drivers also use this route to travel north from Long Beach to the 605 Freeway and for shopping in Hawaiian Gardens.

By 1990, some El Dorado residents began to ask Long Beach to close Pioneer Boulevard at the Long Beach border. Before this litigation was brought, in an effort to reduce traffic and safety problems in the Ritchie/Claremore corridor, Long Beach placed additional stop signs at intersections, reduced speed limits, and placed double-yellow lines with reflectors down the center of the streets.

In February 1993, at the request of the councilmember whose district includes El Dorado, Long Beach ordered a study of the traffic problems in

---

[1]When El Dorado was originally constructed, the north end of Ritchie/Claremore was closed and barricaded. At the time the 605 Freeway was constructed, Long Beach granted a petition by Caltrans (California Department of Transportation) to open Ritchie/Claremore to Pioneer to permit freeway access.

the neighborhood. In April 1993, the Traffic and Infrastructure Committee of the Long Beach City Council held a hearing on the El Dorado traffic problems, took four hours of testimony, and received numerous documents submitted by residents. El Dorado residents complained about excessive traffic on Ritchie/Claremore and of an increasing number of accidents, and said that drivers frequently ran the stop signs and exceeded posted speed limits.

Gerhardt H. Felgemaker, environmental planning officer for Long Beach, was asked to conduct an initial study for a trial one-year closure of Pioneer Boulevard. In November 1993, the Long Beach Planning Commission certified the environmental impact report (EIR) for the street closure. The EIR was transmitted to the Long Beach City Council which considered it in adopting Resolution No. C-25549. The resolution would implement the trial street closure of Pioneer/Ritchie. In a declaration submitted in opposition to Hawaiian Gardens' petition for writ of mandate, Mr. Felgemaker explained: "Because the Final EIR, even _after_ the imposition of mitigation measures, could result in increased traffic on streets within the City of Hawaiian Gardens and in Long Beach south of Wardlow Road during the study period, the City Council chose to adopt a Statement of Overriding Considerations based upon the fact that the benefits of the project outweighed such effects for the following reasons: [¶] 'A. The proposal implements a policy of the Transportation Element of the General Plan. [¶] B. The proposal will result in improved safety for the residential areas. [¶] C. The proposal will result in the removal of commuter traffic in a residential area.' "

In December 1993, the Long Beach City Council adopted Resolution No. C-25549, providing for a 12-month trial closure of Pioneer Boulevard. The resolution includes findings that the closure of Pioneer is necessary to implement provisions of Long Beach's transportation element of its general plan "intended to protect neighborhood livability by applying appropriate street design criteria to discourage through traffic on neighborhood streets and to minimize adverse traffic impacts" and that Pioneer at the city limits "is not a regionally significant street, highway or thoroughfare."

In January 1994, Hawaiian Gardens initiated this litigation by filing a complaint for declaratory and injunctive relief and for writ of mandate. In its first cause of action, it sought a writ of mandate based upon violations of the Vehicle Code. The second cause of action was for declaratory and injunctive relief under state law. The third cause of action sought declaratory and injunctive relief under 42 United States Code section 1983. The final cause of action sought a writ of mandate for violation of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.). On February 18,

1994, the trial court granted a preliminary injunction enjoining Long Beach from erecting the barrier pending trial.

The parties stipulated to a separate trial of the causes of action for mandate, based upon the three-volume administrative record and additional written evidence. Trial was held July 8, 1994. After brief oral argument regarding the tentative ruling, the trial court apparently adopted the tentative ruling as its minute order. The court relied on the only case to construe the power of a city to close a street under section 21101(f), *City of Poway* v. *City of San Diego* (1991) 229 Cal.App.3d 847 [280 Cal.Rptr. 368]. It found that the proposed closure would implement the circulation (transportation) element of the Long Beach General Plan, but that the closure was inconsistent with local public health and safety. Instead, the court found the closure would promote "the health and safety of some of its own citizens by interfering with the rights of others." The others, who would be adversely affected, were the residents of Hawaiian Gardens. They would be impacted by the diversion of traffic onto residential streets in the area, and an increase in the likelihood of accidents on 223rd Street, which borders both a park and an elementary school. The trial court also relied on portions of the administrative record, including reports by the fire departments for Long Beach and Los Angeles County, that emergency response may be adversely impacted by the closure. Both the Long Beach Police and the Los Angeles Sheriff's Departments also reported that the closure would adversely impact response time. In light of its decision under section 21101(f), the trial court declined to address Hawaiian Gardens' claim under the California Environmental Quality Act.

The parties then stipulated to dismissal of the remaining causes of action and judgment for Hawaiian Gardens was entered. Long Beach filed a timely notice of appeal. Hawaiian Gardens then moved for attorney's fees. After full briefing on that issue, the trial court denied the motion on the ground that Hawaiian Gardens failed to establish entitlement to fees under either Code of Civil Procedure section 1021.5 or 42 United States Code section 1988. Hawaiian Gardens filed a timely appeal from that order.

DISCUSSION

I

 The state has preempted the field of traffic control. (Veh. Code, § 21; *Rumford* v. *City of Berkeley* (1982) 31 Cal.3d 545, 550 [183 Cal.Rptr. 73, 645 P.2d 124].) Section 21 provides: "Except as otherwise expressly provided, the provisions of this code are applicable and uniform throughout

the State and in all counties and municipalities therein, and no local authority shall enact or enforce any ordinance on the matters covered by this code unless expressly authorized herein." As stated in *Rumford*, " 'The streets of a city belong to the people of the state, and every citizen of the state has a right to the use thereof, subject to legislative control . . . . The right of control over street traffic is an exercise of a part of the sovereign power of the state . . . .' [Citation.] ' "The use of the highways for purposes of travel and transportation is not a mere privilege, but a common and fundamental right, of which the public and individuals cannot rightfully be deprived . . . [*A*]*ll persons have an equal right to use them for purposes of travel by proper means*, and with due regard for the corresponding rights of others." ' [Citation.]" (*Rumford, supra,* 31 Cal.3d at pp. 549-550, italics added in *Rumford,* fn. omitted.) "Thus, unless 'expressly provided' by the Legislature, a city has no authority over vehicular traffic control." (*Ibid.*)

In 1982, in *Rumford*, the Supreme Court ruled that the City of Berkeley had no authority to erect traffic barriers that partially closed more than 40 streets. It concluded the closures were not authorized under the version of section 21101 then in effect. (31 Cal.3d at p. 554.) The court held: "[T]he delegation of power to prescribe traffic rules is strictly construed [citation] . . . ." (*Id.* at p. 550.)

In response to the *Rumford* decision, the Legislature enacted an urgency statute in 1982, amending section 21101. (Stats. 1982, ch. 749, § 5, p. 2966.) As amended, section 21101 specified the scope of local authority over traffic matters, from closing roadways no longer needed (subd. (a)) to temporarily closing roadways for celebrations and parades (subd. (e)). Subdivision (f) was added to the statute. In context, it provides: "Local authorities may adopt rules and regulations by ordinance or resolution on the following matters: [¶] . . . [¶] (f) Prohibiting entry to, or exit from, or both, from any street by means of islands, curbs, traffic barriers, or other roadway design features to implement the circulation element of a general plan adopted pursuant to Article 6 (commencing with Section 65350) of Chapter 3 of Division 1 of Title 7 of the Government Code." (Stats. 1982, ch. 749, § 5, pp. 2966-2967.) The Legislature explained the facts necessitating the urgency statute: "The recent California Supreme Court decision in Rumford v. City of Berkeley (S.F. 24239) may make some existing traffic control devices illegal. In order to keep existing traffic control devices operational until a permanent solution is developed, it is necessary that this act take effect immediately." (Stats. 1982, ch. 749, § 8, p. 2968.)

Chapter 749 of the Statutes of 1982 contained two versions of section 21101. Chapter 749, section 5 added subdivision (f), which was to remain in

effect only until January 1, 1984, unless a later statute, chaptered before January 1, 1984, deleted or extended the date. (*Id.* at p. 2967.) Section 6 of the same statute enacted another version of section 21101, to become effective January 1, 1984. This version did not include subdivision (f).

The following year, the Legislature revisited the issue of local traffic control. It amended the version of section 21101 enacted by section 5 of chapter 749. The revised version limits the power of local authorities to regulate roads: "Local authorities, *for those highways under their jurisdiction*, may adopt rules and regulations by ordinance or resolution on the following matters . . . ." (Stats. 1983, ch. 291, § 5, p. 867, italics added.) Subdivision (f) of the 1982 version was reenacted with the following language added: "The rules and regulations authorized by this subdivision shall be consistent with the responsibility of local government to provide for the health and safety of its citizens." (Stats. 1983, ch. 291, § 5, p. 867.) The second version of section 21101 enacted by chapter 749 in 1982, which did not include subdivision (f), was repealed by the 1983 legislation. (Stats. 1983, ch. 291, § 6, p. 867.) Section 21101 has not been amended since 1983.

The only reported decision interpreting section 21101(f) is *City of Poway* v. *City of San Diego, supra,* 229 Cal.App.3d 847 (*Poway*). In *Poway,* the city challenged a decision by the City of San Diego to close Pomerado Road, which had connected Poway and other areas to San Diego since 1908. The general plans of the City of San Diego, the County of San Diego and Poway respectively designated Pomerado Road as a "major street," as "major," or as a "major arterial."

The City of San Diego acted to close Pomerado when it initiated annexation of the County Island tract, which brought Pomerado within its jurisdiction. This portion of Pomerado did not conform to San Diego's design standards, so the developer was required to upgrade the road into a four-lane major road connecting to a section of the road previously widened and improved by Poway. San Diego intended to close Pomerado until an alternative route was opened. By the time the appellate court addressed the issue, the Pomerado reconstruction had been completed, but the alternative route was expected to take at least two more years to complete. (*Poway, supra,* 229 Cal.App.3d at pp. 853-854.)

Poway petitioned for writ of mandate, arguing that the City of San Diego had a duty to reopen the road upon completion of construction. The trial court granted the petition and, by writ of mandate, directed the immediate opening of Pomerado. The Court of Appeal affirmed.

██ The *Poway* court explained the standard of review: "In our normal procedure for reviewing an order deciding a petition for writ of mandate, we

seek to determine if the decision of the trial court was supported by the evidence and was a proper exercise of discretion. [Citation.] On appeal, we are to view the evidence in the light most favorable to the respondent, with all intendments and reasonable inferences made to sustain the findings and the judgment. [Citations.] . . . . [B]ecause these basic facts are largely undisputed, our evaluation of this record is conducted de novo, in determining as matters of law the proper construction of the statutes involved and their application. [Citation.]" (229 Cal.App.3d at pp. 858-859, fn. omitted.)

■ The court concluded: "Evidently, the purpose of the statute was to legalize certain means of traffic control, not to create a broad new delegation of authority to municipalities to close roadways. Consistent with the preemption provisions of section 21, the requirement in section 21101, subdivision (f) that rules and regulations must be adopted to implement a general plan's circulation element appears to be a term of limitation of the powers conferred, not an expansion of them. [Citation.] Similarly, when this urgency legislation was made permanent the following year, the Legislature added two additional terms of limitation: (1) in the preamble, that the local authorities could adopt such rules *for those highways under their jurisdiction*, and (2) that these rules 'shall be consistent with the responsibility of local government to provide for the health and safety of its citizens.' [Citation.] Again, the stated limitations on the operation of this section create the inference that no new delegations of power other than those narrowly defined in the section were intended. [Citation.]" (*Poway*, *supra*, 229 Cal.App.3d at p. 865, italics in original.)

■ Based on the 1983 amendments to section 21101, the *Poway* court concluded that section 21101(f) "should not be interpreted to allow one municipality to close its portion of a regionally significant, safely designed and maintained roadway for reasons of self-interest, to the detriment of those other members of the motoring public who seek to travel the entirety of that road." (229 Cal.App.3d at p. 866.) The court ruled that a municipality cannot infringe on the rights of citizens of the greater metropolitan area to travel from one community to another over publicly owned and controlled streets and highways. (*Ibid.*)

The *Poway* court also ruled that section 21101(f) did not "empower any local authority to promote the health and safety of its own citizens by interfering with the rights of other members of the public to safely travel on the public streets." (229 Cal.App.3d at p. 867.) It recognized the importance of a regional approach to traffic problems. "Regionally significant streets or highways perform a regional, not a municipal function. The fact that some hardship is created by the intensive use of a road upon those whose homes or

businesses are located along the roadway is not dispositive in light of these well-established principles. A parochial decision that goes beyond the scope of section 21101 to close part of a functional regional road that crosses two or more jurisdictions, by means of a general plan or its amendment, is inconsistent with settled law." (*Ibid.*)

The question of the scope of inquiry is crucial here. Long Beach takes a narrow view, focusing only on traffic problems within its borders, and arguing that the Pioneer/Ritchie/Claremore corridor is not regionally significant because it is designated for local use in the Long Beach Transportation Element of the general plan. It points to Hawaiian Gardens' designation of this corridor as "a collector street" which is, according to Edward J. Ruzak, a traffic engineer retained by Long Beach, "[A] street which serves traffic movements within a neighborhood and connects this area with the major highway system. It is not intended to handle long through trips, but performs the same land service function as a local street. Traffic control devices may be installed to protect or facilitate traffic on a collector street but would not be as elaborate as a major street."

Long Beach also emphasizes the overuse of the Pioneer/Ritchie/Claremore corridor, arguing that it cannot be safely used, nor was it designed to be used, by the volume of traffic currently using it. It relies on the opinion of Mr. Ruzak that this is not a regionally significant street. Mr. Ruzak based this opinion on his conclusion that the traffic volume is not commensurate with major arterial status, the designation of the roadway as a collector street by Hawaiian Gardens, and the fact that its widths and traffic controls are not characteristic of those employed for a major traffic carrying facility.

In response, Hawaiian Gardens argues: "There is no authority for Long Beach's assertion that only major arterials or highways can serve a regional function—the Vehicle Code does not say this, nor does Poway." It cites the declaration of its retained traffic engineer, C. Hui Lai, submitted in rebuttal to the declaration of Mr. Ruzak. Mr. Lai stated: "From my 24 years' experience as a traffic engineer, I know of no recognized transportation industry standards that have ever established criteria to determine whether a given roadway is 'regionally significant.' Indeed, 'regionally significant' is not a traffic engineering term at all. I know of no recognized transportation industry standards that conclude or establish that only major highways, those classified as 'arterials' or 'freeways,' can serve regional functions. In my experience, different kinds of streets, from those classified as 'local' to those classified as 'arterials,' are often used to perform regional functions." Mr. Lai went on to state that Pioneer/Ritchie/Claremore is indeed regionally significant, because "(1) it provides motorists, including residents of El

Dorado Park Estates, direct access to the 605 Freeway; and (2) it provides motorists, including residents of El Dorado Park Estates, a direct link to regional facilities such as shopping centers in Cerritos and Lakewood, employment centers in Long Beach and in the surrounding communities, and the Long Beach Airport."

The record supports the trial court's conclusion that Pioneer/Ritchie/Claremore serves a regional function. There is no legislative requirement that a roadway is significant for purposes of section 21101(f) only if it is a street designated as a major arterial in the general plans of municipalities. Such an interpretation is inconsistent with state preemption of traffic control to facilitate the use of streets and highways by all members of the public. If we were to construe section 21101(f) to allow closure of any street designated for "local" use, the authority of municipalities to close streets within their jurisdictions would be vastly expanded. The regional needs of motorists could be hampered by amendments to a general plan to designate a street as "local," allowing closure without adequate consideration of the impact on surrounding areas.

Long Beach argues that *Poway* interpreted the language in section 21101(f), to require that rules and regulations enacted under that statute must "be consistent with the responsibility of local government to provide for the health and safety of its citizens[,]" to prohibit closure of regionally significant roadways. But, as Hawaiian Gardens points out, *Poway* does not say that the factors present in that case must be present if a municipality is to be prohibited from closing a street under section 21101(f). What *Poway* does say is that, under section 21101(f), a municipality must take into account the impact of a closure on nonresident members of the public in the surrounding area.

Section 21101(f) admonishes local governments to provide for the health and safety of "its citizens." But this language cannot reasonably be interpreted to allow a local government to take an action that would have a severe negative impact on surrounding areas, merely because it addresses concerns of its own citizens. Such a parochial approach is inconsistent with the state's preemption of traffic control to promote free public access to streets and highways.

We do not doubt that the traffic problems in El Dorado are serious. But the record also establishes that closure of this corridor is likely to have significant negative impact in Hawaiian Gardens, particularly on nearby 223rd Street which borders both an elementary school and a park. The record also establishes, as the trial court noted, the opposition of local fire and

police authorities to the closure because of the possible impact on the provision of emergency services. This is a factor significant to a determination of whether the closure of the street is consistent with the duty of local government to provide for the health and safety of citizens. We conclude that the trial court acted within its discretion in preventing Long Beach from constructing a barrier across Pioneer Boulevard at its border with Hawaiian Gardens.

## II

Hawaiian Gardens appeals from the trial court's order denying its application for attorney's fees under Code of Civil Procedure section 1021.5 (private attorney general doctrine) and under 42 United States Code section 1988.

Code of Civil Procedure section 1021.5 provides in relevant part: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement, *or of enforcement by one public entity against another public entity*, are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any. With respect to actions involving public entities, this section applies to allowances against, but not in favor of, public entities, and no claim shall be required to be filed therefor, unless one or more successful parties and one or more opposing parties are public entities, in which case no claim shall be required to be filed therefor under Part 3 (commencing with Section 900) of Division 3.6 of Title 1 of the Government Code." (Italics added.)

There are three requirements for recovery of attorney's fees under the private attorney general doctrine: (1) one must be a successful party in an action resulting in the enforcement of an important right affecting the public interest; (2) a significant benefit, whether pecuniary or nonpecuniary, must have been conferred on the general public or a broad class of persons, and (3) the necessity and financial burden of private enforcement must transcend the litigant's personal interest in the controversy. (See *Hewlett* v. *Squaw Valley Ski Corp.* (1997) 54 Cal.App.4th 499, 543-544 [63 Cal.Rptr.2d 118].) " ' "Whether a party has met the requirements for an award of fees and the reasonable amount of such an award are questions best decided by the trial court in the first instance. [Citations.] That court, utilizing its traditional equitable discretion, must realistically assess the litigation and determine

from a practical perspective whether the statutory criteria have been met. [Citation.] Its decision will be reversed only if there has been a prejudicial abuse of discretion. [Citation.] To make such a determination we must review the entire record, paying particular attention to the trial court's stated reasons in denying or awarding fees and whether it applied the proper standards of law in reaching its decision." [Citation.]' . . . ." (*Ibid.*)

 The trial court focused on the third prong of the test, finding that Hawaiian Gardens "has not demonstrated that the necessity of litigation has burdened it 'out of proportion to [its] individual stake in the matter. [Citation.]' Woodland Hills Residents Assn. v. City Council (1979) 23 Cal.3d 917, 941 [154 Cal.Rptr. 503, 593 P.2d 200] . . . ." The court recognized that Hawaiian Gardens had met the first prong, finding that it had conferred a significant benefit on the persons living in the area which would have been affected by the closure. But it found there had been no showing that the necessity and financial burden were such as to make a fee award appropriate. Instead, the court found: "The sole beneficiaries of the instant litigation are the residents of Hawaiian Gardens who would have been affected by the erection of the private gate. It is apparent from the briefs and declarations filed in this case that the issue of the private gate was mainly of local interest to the residents of the City of Hawaiian Gardens. County of Inyo [v. *City of Los Angeles* (1978)] 78 Cal.App.3d [82,] 90 [144 Cal.Rptr. 71]. And the litigation itself was not lengthy, complex or protracted: it cannot be said that petitioner was 'burdened out of proportion to its individual stake' in this proceeding. [Citations.]" The court also found that Hawaiian Gardens had not demonstrated that it had met the second prong of the test, in that it had not conferred a substantial benefit to anyone other than its residents. The trial court concluded that there was no showing that a unique legal issue was involved.

The record establishes that Hawaiian Gardens and its citizens received a substantial benefit when the proposed closure of Pioneer Boulevard was blocked. We agree with the trial court that while the judgment was of regional benefit, there is no showing that the burden of the litigation transcended Hawaiian Gardens' interest in the controversy. The case was tried primarily on the administrative record compiled by Long Beach before the resolution was adopted. There was a brief hearing before the trial court. We find no abuse of the trial court's discretion in denying an award of fees under Code of Civil Procedure section 1021.5.

The trial court also denied Hawaiian Gardens' application for attorney's fees under 42 Unites States Code section 1988. It noted that it had not considered or addressed any civil rights issue in rendering judgment for

Hawaiian Gardens. Nor had there been a settlement of the 42 United States Code section 1983 claim; that claim was dismissed after Hawaiian Gardens prevailed on the mandate causes of action.

In *Board of Administration* v. *Wilson* (1997) 57 Cal.App.4th 967 [67 Cal.Rptr.2d 477], the Court of Appeal held that the California Public Employees' Retirement System was not entitled to an award of fees under 42 United States Code section 1988 because the case was neither pled nor tried as a section 1983 case. The reviewing court noted that the parties had not requested, and the trial court had not made, any findings peculiar to the section 1983 civil rights claim. Until the application for attorney's fees was made, no aspect of section 1983 was argued by the parties. (57 Cal.App.4th at p. 972.) Under these circumstances, the court concluded: "[I]t would be prejudicial to respondents and unfairly surprise them (and the Court) to belatedly invoke this one remedial aspect of section 1983." (*Ibid.*)

We agree with that analysis. Here, although Hawaiian Gardens pled a cause of action under 42 United States Code section 1983, the case was tried on the mandate theories only. The trial court did not abuse its discretion in denying the application for fees on this theory.

DISPOSITION

The judgment is affirmed. The parties are to bear their costs on appeal.

Hastings, J., and Baron, J., concurred.