[No. B138964. Second Dist., Div. Two. Oct. 18, 2000.]

SAVE OPEN SPACE SANTA MONICA MOUNTAINS, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; COUNTY OF LOS ANGELES et al., Real Parties in Interest.

238

. COUNSEL

Law Offices of Frank P. Angel, Frank P. Angel and Curtis M. Horton for Petitioner.

Law Offices of J. William Yeates, J. William Yeates and Mary U. Akens for Planning and Conservation League and Mountain Lion Foundation as Amici Curiae on behalf of Petitioner.

Crosby, Heafey, Roach & May, Paul D. Fogel and Jacques LeBoeuf for Sierra Club Foundation as Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

Cox, Castle & Nicholson, Stanley W. Lamport, Stephen E. Abraham and Valerie L. Flores for Real Parties in Interest.

John J. Sansone, County Counsel (San Diego), Diane Bardsley, Assistant County Counsel, and C. Ellen Pilsecker, Deputy County Counsel, for County of San Diego as Amicus Curiae on behalf of Real Parties in Interest.

Anthony J. La Bouff, County Counsel (Placer), and Valerie D. Flood, Deputy County Counsel, for County of Placer as Amicus Curiae on behalf of Real Parties in Interest.

## OPINION

**BOREN, P. J.**—Petitioner, Save Open Space Santa Monica Mountains (SOS), sought attorney fees under California's "private attorney general" statue. The lawsuit concerned proposed land development in an area known as Stokes Canyon. To meet petitioner's claim for an award of "private attorney general" attorney fees, real parties in interest sought to discover the financial obligations and contributions of Stokes Canyon residents relative to the employment of the SOS attorneys. The superior court granted an order denying, in part, SOS's ensuing motion to quash and for a protective order. We find that real parties have sufficiently established the need for discovery but limits the scope of such discovery to assure protection of the constitutional right of those joining SOS's cause. We will therefore issue a peremptory writ directing the superior court to enter an order that limits the manner in which the amount of contributions and the identity of contributors are disclosed.

### I. FACTUAL AND PROCEDURAL HISTORY

SOS is a nonprofit organization founded in 1989. According to its mission statement, SOS is devoted to maintaining open space, protecting wildlife,

and preserving natural resources, primarily in the Santa Monica Mountains National Recreation Area. SOS seeks to accomplish its goals by, among other things, forcing planning agencies to adhere to existing planning laws. For this purpose, SOS sets up tax deductible accounts to help fund litigation against developments, which, SOS believes, violate planning laws.

In July 1998, SOS petitioned the superior court for a writ of mandate to compel real parties in interest the County of Los Angeles and the Los Angeles County Department of Regional Planning (collectively the County) to vacate decisions approving time extensions to maps for two neighboring proposed land divisions—one large (approximately 443 acres) and one small (approximately 34 acres)—on undeveloped, mountainous land in the Santa Monica Mountains.[1] SOS claimed, among other things, that in approving the tentative map extensions, the County violated the Subdivision Map Act (Gov. Code, § 66410 et seq.), as well as a County subdivision ordinance. SOS named the owners of the two land divisions (and related individuals and entities) as the real parties in the superior court writ proceeding.[2]

In its complaint, SOS raised three alternative arguments as to why each of the two map extensions was illegal. The trial court (Judge Robert H. O'Brien) agreed with one of the arguments concerning the map for the large land division, but rejected SOS's other contentions. In August 1999, the court entered judgment for SOS on one cause of action and for real parties on the remaining causes of action.[3] The court also issued a writ of mandate directing the County to set aside the decision approving the one-year extension for the large land division. A different trial judge (Judge James A. Bascue) denied real parties' motion for a new trial.

Yet another trial judge (Judge Dzintra I. Janavs)[4] determined that SOS was the prevailing party as defined in Code of Civil Procedure section 1032, subdivision (a)(4).[5] SOS then filed a motion seeking approximately $140,000 in attorney fees and expenses under California's "private attorney

[1]Because the land divisions straddle Stokes Canyon Road, the litigation is sometimes referred to as the Stokes Canyon litigation.

[2]Certain litigants designated as real parties in interest here were named as real parties in the superior court writ proceeding, including Brian Boudreau, Malibu Canyon L.P. (erroneously sued as Malibu Canyon Limited Partnership), Diamond West Engineering, Inc., Steven D. Dallas, Trustee, William D. Dallas, Trustee, Robert K. Levin, Soka University of America, Inc., Arthur Alisi, Mary Alisi, and Vera Cecere. Because it reflects their status before this court, we refer to these parties, as well as to the County (the respondent below), collectively as real parties.

[3]Real parties appealed, and SOS cross-appealed, from the judgment.

[4]Judge Janavs presided over all subsequently referenced trial court proceedings.

[5]All undesignated statutory references are to the Code of Civil Procedure.

general" statute, section 1021.5. SOS claimed, among other things, that the lawsuit resulted in the enforcement of important rights affecting the public interest and conferred a significant benefit on the public.

Seeking evidence to oppose the motion for attorney fees, real parties noticed the deposition of the SOS persons "most knowledgeable" about the terms and conditions of the retainer agreement, the work performed by counsel, and the payments made to counsel. Real parties also demanded production of copies of the retainer agreement and of the checks used to pay counsel.

SOS moved for a protective order and imposition of sanctions, claiming that the information sought was irrelevant to the court's consideration of SOS's section 1021.5 motion for attorney fees, and that the discovery would violate the attorney-client privilege and the attorney work product doctrine.

In opposition to SOS's motion for protective order, real parties, citing *Williams v. San Francisco Bd. of Permit Appeals* (1999) 74 Cal.App.4th 961 [88 Cal.Rptr.2d 565], justified their discovery request on the ground that "courts have uniformly recognized that an attorney fee award is inappropriate when the applicant has a large economic or non-economic stake in the outcome." Real parties claimed that when a litigant's "primary interest in bringing the action is to protect private property interests rather than to advance the public interest, a [litigant] cannot recover fees under the private attorney general doctrine." Real parties extended that principle to encompass also a rule that a public interest entity which pursues the "private interests of its constituents rather than the broader public interests" is not entitled to attorney fee reimbursement.

On the foregoing basis, real parties urged that "[t]here is evidence that [SOS] has been a party to this proceeding in name only. It appears to the County and Real Parties that this lawsuit has been prosecuted by and for the benefit of three individuals (James Wrigley, Ken Bluestein and Robert Singer) who live on Stokes Canyon Road adjacent to the two subdivisions" at issue in the litigation. Real parties cited as evidence the role Wrigley had played in coordinating the action, the billing statements SOS had provided, and the references to "a fee agreement with the Stokes Canyon residents to finance at least part of the lawsuit," made by counsel for SOS.

In reply, SOS provided the declaration of its board chairperson. The document declares that at the time the SOS board authorized the Stokes Canyon litigation (May 1998), no member of its board was a resident or property owner in Stokes Canyon. The declaration acknowledges that James

Wrigley, a member of SOS and a resident of Stokes Canyon, thereafter became one of the nine board members but states that the other eight board members "are not residents of Stokes Canyon, but come from various geographical regions representing all areas of the Santa Monica Mountains." The declaration also acknowledges that Wrigley had been designated as chief liaison to SOS's litigation counsel. However, simply as part of the reply memorandum—and not part of any declaration—counsel stated that "Kenneth Bluestein and Robert Singer[] happen to be well informed about the history of the proposed residential developments which are the subject of this lawsuit, and the actions which real parties have taken in pursuit of their plans. . . . [¶] None of these individuals have had any authority or control over counsel's representation of petitioner in this lawsuit. . . . Nor have they, or any other individuals, controlled the disbursement of funds raised to pay for attorney fees and expenses incurred by [SOS] in this litigation." A declaration of SOS's counsel states that there is no "fee agreement with the Stokes Canyon residents to finance at least part of this lawsuit."

The trial court conducted a hearing on December 13, 1999. The court held that sanctions would be denied and opined that the discovery of the retainer agreements was important. The court indicated its willingness to examine any documents in camera to ensure privileged material was not revealed. Real parties' attorney argued "that organizations such as Save Open Space are . . . selling their service to private interests saying, 'We'll get you attorney fees as a private attorney general and we'll help you pursue your lawsuit against your neighborhood project.' " The attorney maintained that the only way to get to the merits of that situation was through discovery. The trial court agreed that the payment documents (e.g., the checks used to pay SOS's counsel) should be disclosed, and so ordered. The trial court denied the motions for a protective order and for sanctions and ordered compliance with the subpoenas and notices for deposition which had been issued, subject to the assertion of attorney-client privileges. SOS did not seek writ relief from this court.

Real parties in the meanwhile had served notices for two additional depositions together with subpoenas. The two deposition notices concerned payment of attorney fees by two nonprofit organizations: Sierra Club Foundation (SCF) and Social and Environmental Entrepreneurs, Inc. (SEE). The notices referred to deposition of the "persons most knowledgeable" or "most qualified to testify about" about the funding of SOS's Stokes Canyon litigation with respect to SCF and SEE.

Concerning these two deposition notices, the trial court conducted a further hearing on December 20, 1999, during which SOS advanced claims

of privilege based on a "right of financial privacy of third parties" and the First Amendment right of association. Without ruling on the privileges, the trial court indicated that SOS could file a further motion for a protective order and scheduled a hearing thereon for January 25, 2000. The court rescheduled the hearing on SOS's section 1021.5 motion for attorney fees to February 25, 2000.

Following the December 20, 2000 hearing, real parties noticed the depositions of James Wrigley and Robert Singer.

SOS filed a motion to quash the deposition subpoenas, for a protective order, and for sanctions on December 30, 1999. The motion set forth the argument that real parties' discovery requests are improper because they (1) seek information that is irrelevant to SOS's fee request, (2) seek information that is protected by the attorney-client privilege, and (3) infringe upon the constitutionally protected right of freedom of association.[6]

Attached to the motion as exhibits are the agreement and agreement amendment retaining the SOS counsel, which counsel had provided to real parties' counsel on December 13, 1999. The original agreement capped fees at $35,000, and the amendment raised the cap by $10,000 (apparently to cover the appeal from the underlying disposition in this case.) There was no cap as to expenses.

The retainer agreement also provides: (1) the retention of the law firm ("Law Offices of Frank P. Angel") is "on behalf of [SOS] and the Financially Responsible Party"; (2) the "Financially Responsible Party" is identified as James D. Wrigley, who "expressly agrees to assume personal financial responsibility for the payment of all attorneys' fees and expenses incurred in connection with the Firm's services in this matter" but his liability is "limited to $10,000"; (3) "James D. Wrigley is not Firm's client. Firm's only client is [SOS]"; (4) Wrigley is to send copies of the billing statements "to the Sierra Club Foundation in San Francisco, with an instruction to pay Firm the amount due, out of the fund entitled 'Stokes Canyon Litigation' "; (5) in the event the Firm recovers attorney fees and expenses, "the Stokes Canyon Litigation Fund and . . . Wrigley shall recover the payments [they have made] to Firm for fees and expenses" and the "Firm shall recover the difference" [i.e., any residual from attorney fees award or settlement]; (6) SOS is also "reminded that [Wrigley] has a financial relationship with Firm," that Wrigley's liability "depends upon the amount of

---

[6]SCF sent a letter to the trial court in which it apparently sought to join in SOS's motion, but the trial court rejected the informal letter as procedurally improper.

cash available in the Stokes Canyon Litigation Fund for payment of attorneys' fees and expenses under this agreement," and that therefore, Wrigley "may have interests adverse to those of [SOS]"; and (7) SOS "has designated its member James D. Wrigley as Firm's chief liaison with it." Both Wrigley and the SOS board chairperson, Mary E. Wiesbrock, signed the agreement and its amendment.

With the retainer agreement, SOS had also at the same time disclosed to real parties seven cancelled checks by which counsel for SOS had been paid. Three of the checks were paid by SCF in the respective amounts of $16,520.40 (dated Sept. 4, 1998), $3,720 (dated Dec. 7, 1998), and $3,720 (dated Mar. 12, 1999). Three were paid by SEE in the respective amounts of $1,000 (dated Dec. 17, 1998), $5,317.50 (dated Apr. 2, 1999), and $1,547.51 (dated Sept. 21, 1999). A seventh check for $1,000 (dated Apr. 13, 1999) was made out by Rosemary Woodlock on an "ITF SAVE OPEN SPACE SANTA MONICA MOUNTAINS ATTORNEY TRUST ACCOUNT." These checks total $32,825.41.

The day after the foregoing discovery was made, SOS Attorney Curtis Horton was deposed, upon his representation that he was the most knowledgeable or most qualified person to provide information concerning the funding of the litigation. The deposition indicated that both SCF and SEE had established project fund accounts for the purpose of funding the Stokes Canyon litigation. Horton explained that SEE "is a local organization which provides a similar service to the Sierra Club Foundation" by "providing a way for nonprofit noncharitable organizations to receive tax deductible donations for a particular preapproved grant to a grassroots environmental organization, such as [SOS]." He explained that both SCF and SEE "collect[] funds earmarked for a particular project and then disburse[] those funds for that project. . . ."

Little or no specific information about contributions or the solicitation of contributions to the Stokes Canyon Litigation Fund accounts was revealed in the deposition. Horton could not say who had paid into the SCF or SEE Stokes Canyon litigation project funds, stated that he had intentionally avoided acquiring such information, and maintained he would refuse to disclose it if he had it. Likewise Horton revealed little information about the involvement of Wrigley, Bluestein, Singer, or other Stokes Canyon residents. With regard to the retainer agreement, Horton acknowledged that, while SOS had agreed to establish the Stokes Canyon Litigation Fund, SOS had no obligation to pay any money to Horton's firm. Moreover, Wrigley was obligated as the "Financially Responsible Person" only if the law firm made a demand upon him.

On January 25, 2000, the trial court, after hearing, denied SOS's motion, except to impose some limitations on the information real parties could obtain concerning donors and donation amounts. The written order was filed February 8, 2000. Regarding the identity of individual donors, the court ruled real parties were entitled to learn the identity of only the 10 largest donors and donors who reside in certain areas near the proposed land divisions, as well as the amounts contributed by each of these donors. The court ruled this information could be disclosed only to persons who need the information for the litigation and could be used only for the purpose of this litigation.

The court also ruled respecting the deposition and deposition subpoenas for Wrigley and Singer that "questions at the deposition and documents to be produced shall be limited to raising of funds and financing of this litigation." This petition for writ of mandate followed.

## II. Issue

The issue presented is whether the trial court abused its discretion in allowing real parties to discover information relevant to the issue of whether SOS, a public interest organization, litigated the Stokes Canyon litigation for and at the direction of a specific group of individuals—individuals real parties claim have a substantial private interest in the outcome of the litigation.

## III. Discussion

### A. Writ Review

Where, as here the issues presented are of first impression and of general importance to the trial courts and to the profession, writ review is appropriate. (*Britt v. Superior Court* (1978) 20 Cal.3d 844, 851 [143 Cal.Rptr. 695, 574 P.2d 766] (*Britt*); *Johnson v. Superior Court* (2000) 80 Cal.App.4th 1050, 1060-1061 [95 Cal.Rptr.2d 864] (*Johnson*).)

### B. Standard of Review

"Management of discovery lies within the sound discretion of the trial court. Consequently, appellate review of discovery rulings is governed by the abuse of discretion standard. [Citation.] Where there is a basis for the trial court's ruling and the evidence supports it, a reviewing court will not substitute its opinion for that of the trial court. [Citation.]" (*Johnson, supra,* 80 Cal.App.4th at p. 1061.) The trial court's determination will be set aside

only when it has been established that there was no legal justification for the order granting or denying the discovery in question. (*Ibid.*)

C.  *Scope of Discovery*

As a general rule, a party may obtain discovery regarding unprivileged matters "that [are] relevant to the subject matter involved in the pending action or to the determination of *any motion made in that action,* if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence." (§ 2017, subd. (a), italics added; *Bodenheimer v. Superior Court* (1980) 108 Cal.App.3d 885, 887-890 [167 Cal.Rptr. 26].)

Section 1021.5 is a codification of the "private attorney general" doctrine developed in numerous prior judicial decisions. (*Woodland Hills Residents Assn., Inc. v. City Council* (1979) 23 Cal.3d 917, 933 [154 Cal.Rptr. 503, 593 P.2d 200].) In pertinent part, the statute provides trial courts discretion to award attorneys' fees to a successful party in any action "which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any." (§ 1021.5.)

The evidence real parties seek to discover addresses two basic questions. The first is whether the Stokes Canyon litigation is essentially a suit prosecuted by neighboring property owners. The second is whether the purpose of the Stokes Canyon litigation was to advance those property owners' economic or noneconomic interests. Real parties argue that this information is directly relevant to requirement (b) of section 1021.5, i.e., whether "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate."

Not surprisingly, SOS disagrees. SOS contends that because SOS, not the nonparty contributors to the Stokes Canyon litigation fund, pursued the litigation, and because it is "undisputed" that SOS had no personal interest at stake in the lawsuit, information with respect to the contributors to the Stokes Canyon litigation fund is irrelevant to the determination of whether SOS is entitled to an attorney fee award pursuant to section 1021.5. Alternatively, SOS argues that even if the demanded information meets the relevancy standard for discovery, the constitutional right to associational privacy shields the information from disclosure. We examine each of these contentions.

D.  *Contributor Information May Be Discoverable*

█  In order to establish the prerequisite set forth in subdivision (b) of section 1021.5, the party seeking an award on the "private attorney general" theory "bears the burden of establishing that its litigation costs transcend its personal interest." (*Beach Colony II v. California Coastal Com.* (1985) 166 Cal.App.3d 106, 113 [212 Cal.Rptr. 485]; *County of Inyo v. City of Los Angeles* (1978) 78 Cal.App.3d 82, 90 [144 Cal.Rptr. 71].) In deciding whether this burden has been met, a trial court is required to make a "comparison of the *litigant's* private interests with the anticipated costs of suit." (*California Licensed Foresters Assn. v. State Bd. of Forestry* (1994) 30 Cal.App.4th 562, 570 [35 Cal.Rptr.2d 396], italics added.) █ SOS, seizing on the word "litigant," points out that SOS was the litigant in this action, not the contributors who funded the litigation. SOS claims that since it has no stake in the outcome of the Stokes Canyon litigation, either economic or noneconomic, the trial court should have held that the information requested by real parties is irrelevant to the issue of whether SOS's financial burden of attorney fees is out of proportion to its personal interest in litigating the case, and should have concluded that the information is thus irrelevant to the issue of whether SOS qualifies for an attorney fee award under section 1021.5.

SOS cites *Los Angeles Police Protective League v. City of Los Angeles* (1986) 188 Cal.App.3d 1 [232 Cal.Rptr. 697] and *Baggett v. Gates* (1982) 32 Cal.3d 128 [185 Cal.Rptr. 232, 649 P.2d 874] for the proposition that where litigation is financed by a public interest organization a trial court is not entitled to consider the interests of nonparty donors in deciding whether "the necessity and financial burden of private enforcement . . . are such as to make the award appropriate." (§ 1021.5, subd. (b).) Although language contained within *Los Angeles Police Protective League* and *Baggett* can be interpreted to mean that a trial court, in deciding whether an organization is entitled to an attorney fee award under section 1021.5, is required to focus on the interests of the organization rather than on the interests of its members, neither of these cases specifically discusses whether the interests of nonparty contributors to a litigation fund established by a public interest organization may be considered in the context of determining whether to award attorney fees under section 1021.5. Moreover, neither *Los Angeles Police Protective League* nor *Baggett* discusses whether information concerning the establishment of a public interest litigation fund and information concerning the contributors to the fund is discoverable by a party opposing a section 1021.5 attorney fee request.

Courts have refused to award private attorney general fees to litigants who have obtained considerable benefit from litigation challenging public agency

decisions. (See *Williams v. San Francisco Bd. of Permit Appeals, supra,* 74 Cal.App.4th 961, 965 [homeowner who successfully blocked destruction of neighboring Victorian home denied award because he had a strong personal aesthetic interest in not having a large structure built next door to his residence]; *City of Hawaiian Gardens v. City of Long Beach* (1998) 61 Cal.App.4th 1100, 1113 [72 Cal.Rptr.2d 134] [city that successfully challenged neighboring city's street closure not entitled to attorney fees, in part because city's residents "received a substantial benefit when the proposed closure . . . was blocked"]; *County of Inyo v. City of Los Angeles, supra,* 78 Cal.App.3d at p. 90 [county that successfully challenged city's environmental impact report not entitled to private attorney general fees because the county's efforts had primarily benefited its own inhabitants]; *Terminal Plaza Corp. v. City and County of San Francisco* (1986) 177 Cal.App.3d 892, 914 [223 Cal.Rptr. 379] [fees denied to a prevailing neighboring property owner because the owner's "primary purpose in bringing suit was to pursue and protect its own property rights rather than to further a significant public interest"]; *Christward Ministry v. County of San Diego* (1993) 13 Cal.App.4th 31, 49 [16 Cal.Rptr.2d 435] [fees denied to a nonprofit religious organization that brought suit to block expansion of a landfill on neighboring property because the organization's private interest with reference to the use of its property was the "real basis" of the action.].)

We recognize that these cases all involve instances where the interested individuals and entities were parties to the lawsuit. However, we need not blind ourselves to the fact that if individuals or entities having an interest in real property located in the vicinity of Stokes Canyon had prosecuted this action in their own names, it is possible that application of the principles set forth in the foregoing cases would bar them from obtaining a private attorney general fee award.

The parties have cited no authority, and we know of none, that specifically discusses the issue of whether a party opposing a private attorney general fee award is permitted to conduct discovery in order to determine (1) whether a public interest organization has litigated an action for and at the direction of a specific group of individuals, and (2) whether those individuals have a private interest in the outcome of the litigation that would preclude an attorney fee award under section 1201.5.[7]

SCF claims that all such discovery should be prohibited because tax laws governing the tax deductibility of contributions are already in place to

---

[7]Although *Citizens Against Rent Control v. City of Berkeley* (1986) 181 Cal.App.3d 213, 231 [226 Cal.Rptr. 265] suggests that such discovery may not be allowed, it does not hold that such discovery is to be denied in all cases.

reduce substantially the potential that charitable organizations will serve as "unthinking conduits" for private interests. For example, a charitable organization must review any project it is considering sponsoring to ensure that the project comports with the organization's purpose. In addition, charitable organizations must retain complete discretion and control over the use of donated funds and, where the organization has established a specific project fund, the organization must maintain the authority to divert funds to other uses if the project ceases to advance the organization's goals. Consequently, donations that are earmarked for a specific project—i.e., that must be returned to the donor if not put to the specified use—are not tax deductible.

Although state and federal tax agencies may well police nonprofit organizations in an ongoing effort to curb abuses, tax deductibility rules have no application to the question of whether discovery should be allowed to determine, in a private attorney general case, whether an organization is acting as an "unthinking conduit" in order to promote the private interests of a few individuals. The fact that SOS may have complied with applicable tax codes is but one factor to be considered by the trial court in deciding whether a public interest organization has litigated an action for and at the direction of a specific group of individuals.

As real parties contend, there is evidence contained within the record suggesting that "[i]n reality, this case was litigated by and for the benefit of neighbors living in the vicinity of the [affected] subdivisions." For example, the retainer agreement itself makes clear that an individual owning real property in Stokes Canyon (James D. Wrigley) agreed to "assume personal financial responsibility for the payment of all attorneys' fees and expenses incurred in connection" with the Stokes Canyon litigation, with his liability limited to $10,000. In the event the law firm representing SOS prevailed on a section 1021.5 motion, Wrigley was to be reimbursed. His liability depended "upon the amount of cash available in the Stokes Canyon Litigation Fund for payment of attorneys' fees and expenses." In addition, Wrigley was designated as the "chief liaison," which meant that he was to send copies of the billing statements to the SCF with an instruction to pay the law firm representing SOS.

SOS and SCF claim that because SOS and SCF had complete control over the litigation, and because it is possible they will make no demand on Wrigley to pay the attorney fees and expenses, the fact that Wrigley agreed to be financially responsible for the Stokes Canyon litigation attorney fees and costs (up to a certain amount) should the organizations funding the litigation fail to receive donations sufficient to cover these fees and costs is

irrelevant. We disagree. As long as Wrigley remains potentially liable to pay a certain percentage of the fees and expenses incurred by SOS with respect to the Stokes Canyon litigation, he has made a contribution to the litigation fund. It remains to be seen if this contribution is significant enough to compel the conclusion that he has received an important and substantial personal benefit from the litigation.

We conclude that where, as here, the party opposing a section 1021.5 attorney fee award has produced evidence suggesting that a public interest organization is litigating an action primarily for the benefit of nonlitigants, the court should, in order to resolve the issue, allow the opposing party to conduct limited discovery. What kinds of discovery will be permissible is to be decided on a case-by-case basis. We caution, however, that before a trial court orders such discovery it must first determine whether the discovery ordered impermissibly infringes upon important associational privacy rights of third parties.

E.   *The Constitutional Associational Right to Privacy*

■   "[P]eaceful and lawful associational activity is . . . constitutionally protected activity which, under both our state and federal Constitutions, enjoys special safeguard from governmental interference. (Cal. Const., art. I, §§ 1, 2, 3; U.S. Const., 1st Amend.)"[8] (*Britt, supra,* 20 Cal.3d at p. 852.)

Both federal and state courts have recognized that the right of freedom of association encompasses the right of associational privacy, i.e., the right of individuals to maintain anonymity in their group affiliations. Thus, in *N.A.A.C.P. v. Alabama* (1958) 357 U.S. 449 [78 S.Ct. 1163, 2 L.Ed.2d 1488], the United States Supreme Court held that the State of Alabama could not compel the NAACP to disclose the names and addresses of all its Alabama members. The court noted that compelled disclosure of group affiliation may constitute as effective a restraint on freedom of association as far more direct restraints on associational activity and reaffirmed the "vital relationship between freedom to associate and privacy in one's associations." (*Id.* at p. 462 [78 S.Ct. at p. 1172].)

In *Britt,* hundreds of owners and residents of homes located near the San Diego International Airport filed suit against the operators of the facility, seeking damages for diminution of property values, personal injuries, and

---

[8]Article I, section 1, of our state Constitution provides that "[a]ll people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

emotional distress stemming from noise, vibrations, and air pollution. (*Britt, supra,* 20 Cal.3d at p. 849.) In deposing a number of the plaintiffs, the defendant attempted to investigate the plaintiffs' local political activities in connection with the operation of the airport, allegedly relevant to its defenses of res judicata, failure to mitigate damages and the statute of limitations. Specifically, the defendant asked about the plaintiffs' membership in various organizations opposed to the way in which the defendant operated the airport, any meetings which the plaintiffs may have attended concerning the airport, including dates, topics and speakers, any correspondence which the plaintiffs received from such organizations, the identity of other people who attended meetings, the content of discussions with others regarding the meetings, the identity of those persons with whom the plaintiffs discussed such matters, and any financial contributions by the plaintiffs to such organizations, including the amount, date, and identity of the person or persons requesting funds. (*Id.* at p. 850.) The defendant also asked the plaintiffs to produce, at the taking of their depositions, various documents, including applications for membership, pledges of funds and cancelled checks reflecting payment of any dues, fees or contributions to the organizations opposed to the way in which the airport was being operated. (*Ibid.*) Ultimately, our California Supreme Court determined that such "wholesale disclosure" was unwarranted, and that the discovery order was constitutionally infirm. (*Id.* at pp. 861-862.) In so holding, the *Britt* court noted that "compelled disclosure of an individual's private associational affiliations and activities . . . frequently poses one of the most serious threats to the free exercise of this constitutionally endowed right." (*Id.* at p. 852.)

Real parties claim that the right to association is not implicated here because real parties are not seeking membership lists or information about the political or organizational affiliations of contributors to SOS, SCF or SEE. However, the right to associate with an organization is not limited to the right to become a member of that organization. Individuals can choose to associate with groups in any of a number of forms, including the making of financial contributions. (See *Barnes v. State Farm Mut. Auto. Ins. Co.* (1993) 16 Cal.App.4th 365, 372 [20 Cal.Rptr.2d 87] [holding political expenditures and contributions are forms of political speech]; *Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 688, fn. 2 [47 Cal.Rptr.2d 108, 905 P.2d 1248], (conc. & dis. opn. of Baxter, J.) ["As the United States Supreme Court recognized in its landmark decision upholding federal campaign contribution limits, '[m]aking a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources in furtherance of common political goals.' [Citation.] For these reasons, the high court observed, contribution limits

implicate fundamental First Amendment interests, such as the rights of political expression and association."].)

It would thus appear that the right of privacy and a derivative right of confidentiality, as described in *Britt, supra,* 20 Cal.3d 844, are generally applicable to membership in and contribution to public interest organizations such as those affected by the trial court's discovery order in this case, i.e., SOS, SCF and SEE.

## F. *Balancing of the Competing Interests*

■ "Where discovery involves matters encompassed by the right to privacy, courts recognize that 'judicial discovery orders inevitably involve *state-compelled* disclosure . . . .' [Citation.] Therefore, in reviewing a party's resistance to a discovery order, based on the claim that it entrenches upon a constitutional right, we treat the compelled disclosure as a product of state action subject to constitutional constraints. [Citation.]" (*Mendez v. Superior Court* (1988) 206 Cal.App.3d 557, 566-567 [253 Cal.Rptr. 731].)

■ The right of associational privacy is not absolute. (*Britt, supra,* 20 Cal.3d at p. 855; *Johnson, supra,* 80 Cal.App.4th at p. 1070.) The party seeking discovery of private matters must do more than satisfy the relevancy standard set forth in section 2017. (See *Lantz v. Superior Court* (1994) 28 Cal.App.4th 1839, 1853 [34 Cal.Rptr.2d 358].) He is required to demonstrate a "compelling need" for the discovery, and "that compelling need must be so strong as to outweigh the privacy right when these two compelling interests are carefully balanced." (*Id.* at pp. 1853-1854.)

The *Britt* court, in analyzing the interests that would warrant disclosure, noted that the filing of a lawsuit "may implicitly bring about a partial waiver of one's constitutional right of associational privacy." (*Britt, supra,* 20 Cal.3d at p. 859.) The court cautioned, however, that "the scope of such 'waiver' must be narrowly rather than expansively construed, so that plaintiffs will not be unduly deterred from instituting lawsuits by the fear of exposure of their private associational affiliations and activities. [Citation.]" It is only "[w]hen such associational activities are *directly relevant* to the plaintiff's claim, and disclosure of the plaintiff's affiliations is essential to the fair resolution of the lawsuit, [that] a trial court may properly compel such disclosure. [Citation.] Even under such circumstances, however, the

general First Amendment principles . . . dictate that the compelled disclosure be narrowly drawn to assure maximum protection of the constitutional interests at stake." (*Ibid.*)[9]

The court abuses its discretion to resolve discovery disputes if it fails to undertake the required balancing of the associational privacy interests against the interests allegedly compelling disclosure. (See *Johnson, supra,* 80 Cal.App.4th at p. 1073; *Lantz v. Superior Court, supra,* 28 Cal.App.4th at p. 1857.)

"The strength of an individual's interest in keeping personal information private depends in large part on the consequences of disclosure. Courts look to 'human experience' to determine the likely effect of disclosure of the information at issue. [Citation.] For example, in [*City of San Jose v. Superior Court* (1999) 74 Cal.App.4th 1008, 1024 [88 Cal.Rptr.2d 552]] the court ruled that a newspaper could not compel a city to disclose the names, addresses and telephone numbers of individuals who had complained about airport noise. The court reasoned that it could infer from human experience that public disclosure of that information would 'have a chilling effect on the number of complaints made' and that it would 'subject the complainants to the loss of confidentiality in their complaints, and also to direct contact by the media and by persons who wish to discourage complaints.' [Citation.]" (*Planned Parenthood Golden Gate v. Superior Court* (2000) 83 Cal.App.4th 347, 360 [99 Cal.Rptr.2d 627].)

The donors to the Stokes Canyon Litigation Fund have an interest in preserving their right to freely and privately associate with SOS. SOS has an interest in protecting the associational privacy rights of its donors so as to encourage these same donors, and others, to contribute funds to future projects.

Real parties, on the other hand, have a legitimate interest in ensuring that attorney fees are not awarded where the statutory requirements set forth in section 1021.5 are not met. And, because attorney fee awards paid by the County are necessarily paid from taxpayer funds, County taxpayers have an interest in limiting unwarranted attorney fee awards so that funds needed for public services are not diverted to pay unauthorized attorney fees. The state (and thus all taxpayers) has an interest in ensuring that charitable contributions are not shams—and that the donated funds truly become the property of the charity that receives them. Equally as important as these interests is

---

[9]Although the waiver argument in *Britt* was based on the filing of a lawsuit as opposed to the filing of a motion for attorney fees, the same analysis applies.

the state's compelling interest, as reflected in its broad discovery statutes, in " 'facilitating the ascertainment of truth in connection with legal proceedings.' [Citation.]" (*Britt, supra,* 20 Cal.3d at p. 857; *Johnson, supra,* 80 Cal.App.4th at p. 1071.)

To determine whether the state's interest in "seeking the truth in court proceedings" (*Johnson, supra,* 80 Cal.App.4th at p. 1071) outweighs the privacy interests in this case, we must balance the privacy interests against real parties' need for discovery. (See, e.g., *Palay v. Superior Court* (1993) 18 Cal.App.4th 919, 934 [22 Cal.Rptr.2d 839]; *Johnson, supra,* 80 Cal.App.4th at p. 1070.)

When ruling on a motion for attorney fees under section 1021.5, the court is required to "realistically assess the litigation and determine, from a practical perspective," whether or not the statutory requirements have been met. (See *Woodland Hills Residents Assn., Inc. v. City Council, supra,* 23 Cal.3d at p. 938; *Baggett v. Gates, supra,* 32 Cal.3d at p. 142.) A trial court cannot realistically assess the interests of a fee applicant if the applicant (and hence the nature and extent of his interest) can be hidden behind a public interest organization. This case may, or may not be an example of a creative attempt to recover private attorney general fees through the use of a private interest organization. However, because different conclusions can be drawn from the evidence, in this case the trial court needs a complete record in order to assess the truth of the matter. To deny those opposing a fee request and, in turn, a trial court, the means to discover whether an organization is litigating a case to further private interests would open the door for abuse of the private attorney general statute.

While the consequences of disclosure of donor information may properly be characterized as profound in some cases, this is not such a case. We are not convinced that disclosing, in increments and in camera, information concerning donations made to a litigation fund, and, if necessary, the names of some of the donors, will have, as SOS and amicus curiae contend it will, an undue chilling effect on the willingness of concerned citizens to contribute funds to public interest organizations.

Although the privacy interests of the donors and SOS are strong, the real parties' interests are equally strong, and the state's interest in promoting truth in litigation is particularly strong. We conclude that real parties have demonstrated a need for the discovery which would justify an invasion of the privacy interests involved, since the evidence sought by real parties is crucial to the court's thorough analysis of SOS's attorney fee request.

## G. *The Protective Order*

■ Even when "an intrusion on the right of privacy is deemed necessary under the circumstances of a particular case, any such intrusion should be the minimum intrusion necessary to achieve its objective." (*Lantz v. Superior Court, supra,* 28 Cal.App.4th at p. 1855, citing *Wood v. Superior Court* (1985) 166 Cal.App.3d 1138 [212 Cal.Rptr. 811].) Here, the court ruled that the County is entitled to learn the identity of the 10 largest donors and donors who reside in certain areas near the proposed land divisions, as well as the amounts contributed by each of these donors. The court ruled this information could be disclosed only to persons who need the information for the litigation and could be used only for the purpose of this litigation. The court also ruled with respect to the deposition and deposition subpoenas for Wrigley and Singer that "questions at the deposition and documents to be produced shall be limited to raising of funds and financing of this litigation." The court's order, we conclude, is too intrusive.

In order to determine whether SOS is entitled to prevail on its private attorney general fee request, information concerning donations made to the Stokes Canyon Litigation Fund must be provided to the court for an in camera review. The court should direct SOS to provide to the court (or to a discovery referee should the court so order) documents showing the total amount of money contained within the fund, and the amounts donated to the fund by each of the contributors.[10] SOS need not, at this initial in camera review, disclose the names or addresses of the donors. If the court determines that none of the contributions is significantly and substantially large,[11] the inquiry ends at this point. However, if the court determines that one or more of the donations is substantial, the court must then direct SOS to provide the court with information concerning whether any of the donors contributing significant amounts own or has an interest in any of the real property in and around the Stokes Canyon area. If not, the inquiry ends at this point. But if, it appears that one or more donors making substantial contributions to the Stokes Canyon Litigation Fund own or have an interest in real property located in or around the Stokes Canyon area, the court must direct SOS to provide the names and addresses of these donors to real parties with instructions that this information can be disclosed only to persons who need the information for the litigation and can be used only for the purpose

---

[10]This list should include any conditional contributions made to the fund.

[11]In deciding whether a donation is significantly and substantially large, the court should consider various factors, including the fee cap contained within the retainer agreements. Under the circumstances of this case, we conclude, a court may—at this initial review—determine that a donation is significantly and substantially large if the amount donated is approximately 10 percent of the fee cap.

of this litigation. Assuming the court gets to this point, the court may then direct Wrigley and Singer to appear for deposition and to respond to the document request.

## IV. DISPOSITION

Let a peremptory writ of mandate issue directing respondent trial court to set aside its order of February 8, 2000, denying SOS's motion to quash and for a protective order and to enter a new and different order consistent with the views expressed in this opinion. The order to show cause, having served its purpose, is dissolved, and the temporary stay is vacated. Petitioner's request for sanctions is denied. The parties to bear their own costs.

Nott, J., and Cooper, J., concurred.

A petition for a rehearing was denied November 8, 2000.